UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE RUIZ,<br><br>        Plaintiff,<br><br>        v.<br><br>M. SOLOPOW,<br><br>        Defendant. | Case No. 20-cv-01089-DMR<br><br>**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 57 |

This case arises out of an incident that occurred on October 3, 2017, when Plaintiff Jose Ruiz was incarcerated in Santa Rita Jail, which is in Alameda County, California. Ruiz brings a single claim under 42 U.S.C. § 1983 against Defendant Deputy Sheriff Marc Solopow. Solopow moves for summary judgment. [Docket Nos. 57 ("Mot."), 62 ("Reply").] Plaintiff opposes. [Docket No. 60 ("Opp.").] The court held a hearing on July 22, 2021.

For the reasons stated below, the motion is denied.

**I.  BACKGROUND**

    **A.  Factual Background**

The following sets forth the parties' respective testimony about the incident underlying the claim in this case.

        **1.  Solopow's Testimony**

On October 3, 2017, Solopow was on duty in Santa Rita Jail and was assigned to monitor Housing Unit 23, where Ruiz was being held. [Docket No. 57-3, Declaration of Marc Solopow ("Solopow Decl.") ¶¶ 2-3.] At that time, Ruiz was in pretrial proceedings for various criminal charges. *Id.* ¶ 5. Around 7:40 p.m., Solopow was conducting a walkthrough of Housing Unit 23 and heard "yelling and pounding coming from the east side of the housing unit." *Id.* ¶ 7. However, the "disturbance abruptly stopped" shortly after he entered the housing unit. *Id.* ¶ 8. Several inmates

told Solopow that they believed the disturbance was coming from Ruiz's cell. *Id.* ¶ 9. Two inmates were in the common area of the housing unit having video visits with their family members and they told Solopow that the noise was disrupting their visitation time with their families. *Id.* ¶ 10. One of these inmates informed Solopow that Ruiz was yelling at him (the inmate). *Id.*

Solopow went to Ruiz's cell to investigate. Solopow Decl. ¶ 11. He looked through the window in the cell door and saw Ruiz alone in the cell, lying on his bed. *Id.* After announcing his presence, Solopow unlocked and opened the cell door. *Id.* Ruiz did not immediately respond, and Solopow believed he was pretending to sleep. *Id.* Eventually, Ruiz sat up to talk to Solopow, although it did not appear to Solopow that he had woken up from being asleep. *Id.* ¶ 12. Solopow told Ruiz that he had received complaints about disturbances coming from Ruiz's cell, including that he had been yelling and pounding. *Id.* ¶ 13. Ruiz stated that he had been asleep and did not know of any disturbances. *Id.* Solopow informed Ruiz that excessive noise was not permitted and instructed him to stop making disturbances. *Id.* Solopow then continued his walkthrough of the housing unit and spoke with several other inmates, all of whom told him that they heard noises they believed came from Ruiz's cell. *Id.* ¶ 14.

While Solopow was still conducting his walkthrough, he again heard yelling from Ruiz's cell. Solopow Decl. ¶ 15. He walked back to the cell and saw Ruiz standing in the middle of his cell, yelling. *Id.* Solopow entered the cell and again informed Ruiz that causing disturbances, including making excessive noise, is a violation of the inmate rules and regulations. *Id.* ¶ 16. He instructed Ruiz to stop making noise. *Id.* Ruiz responded by making an obscene hand gesture, waving his middle finger toward the other cells. *Id.* ¶ 17. He told Solopow that he did not care if other people were complaining about him. *Id.* Solopow states that he was "ultimately able to use verbal directives to help [Ruiz] calm down and cease his aggressive and inappropriate actions." *Id.* However, within seconds of Solopow leaving Ruiz's cell, Ruiz began yelling again. *Id.* ¶ 18. Solopow returned to the cell and once more told Ruiz to stop making noise. *Id.* ¶ 19. Once Ruiz apologized and indicated that he would cease his actions, Solopow continued his walkthrough of the housing unit. *Id.*

At around 7:45 p.m., Solopow was about ten cells away from Ruiz's cell when he heard a

loud pounding noise from that cell. Solopow Decl. ¶ 20. He walked back to the cell, looked through the window on the cell door, and saw Ruiz "repeatedly punching the metal sink in his cell with both hands," alternating between closed fist strikes and open-handed slaps. *Id.* ¶ 21. The noise from the action "echo[ed] through the housing unit." *Id.* Solopow then activated his body worn camera.[1] *Id.*; *see also id.*, Ex. B (Video). Solopow entered Ruiz's cell and asked what he was doing, to which Ruiz responded, "I'm not supposed to exercise?" *Id.* ¶ 24. Solopow again explained that making excessive noise, as well as "mock fighting or practicing fighting moves," was against the rules. *Id.* Ruiz responded "okay," but claimed that he had not done anything wrong. *Id.*

Solopow asked Ruiz why he kept making noise after his prior warnings, to which Ruiz responded that he had previously been "simply talking to himself" and was now "just exercising." Solopow Decl. ¶ 25. Solopow again explained the inmate rules and regulations and began to leave. *Id.* Just as Solopow was closing the door, Ruiz punched the wall of his cell. *Id.* ¶ 26. Solopow opened the door again and told Ruiz once more to stop. *Id.* Ruiz "looked away and began mumbling something incoherent." *Id.* Solopow reiterated that mock fighting was not allowed, to which Ruiz responded, "the wall too?" *Id.* Solopow "again explained the prohibition against mock fighting in any form" but Ruiz "continued to look disinterested and made a dismissive sound." *Id.*

At that point, Solopow believed that he could not "obtain compliance from [Ruiz] through verbal reprimands in his cell." Solopow Decl. ¶ 27. Solopow believed that if he could move Ruiz to another area where other inmates could not hear him, Ruiz "might be forthcoming in explaining what he was doing and why he was continuing to cause a disturbance." *Id.* ¶ 27. Solopow was also "concerned about [Ruiz's] increasingly erratic and unexplained behavior." *Id.* ¶ 28. It was now about 7:47 p.m. and the inmates in that housing unit would be released for recreation time at 8:00 p.m. *Id.* Solopow was concerned that if he allowed Ruiz to remain in the housing unit, "a possible fight or physical disturbance could erupt between the inmates." *Id.* Based on his concern for the safety of the inmates and Ruiz's repeated violations of the rules, Solopow decided to escort Ruiz to

---

[1] According to Solopow, the body camera he was wearing is programmed to retain video footage beginning 30 seconds before it is activated but does not record sound for those 30 seconds. Solopow Decl. ¶ 23. He explains that this is why the video shows him walking toward Ruiz's cell but does not capture the noise that was occurring during that time. *Id.*

3

a temporary holding cell away from the other inmates. *Id.* ¶¶ 29, 35. He thus had Ruiz turn around and put his hands behind his back in order to put handcuffs on him. *Id.* ¶ 29. Solopow then led Ruiz in handcuffs from his cell and down a nearby staircase. *Id.*

As they walked down the stairs, Solopow was slightly behind and to the side of Ruiz, holding the chain between Ruiz's handcuffs with his left hand. Solopow Decl. ¶ 30. Once they reached the bottom of the stairs, Solopow changed his grip such that he was now holding Ruiz's right hand or wrist with his left hand. *Id.* Solopow avers that the grip "is the same escort position I typically use with all inmates." *Id.* As Solopow changed his grip, Ruiz suddenly stopped, causing Solopow to bump into him. *Id.* ¶ 31. Ruiz called Solopow a "puta madre" (which Solopow understands to be Spanish for "bitch" or "whore") and told Solopow not to push him. *Id.* Solopow ordered Ruiz four times to keep walking but each time Ruiz shook his head and said "no." *Id.* ¶ 32. Solopow then repositioned his left arm up and under Ruiz's right arm such that he could put his left palm on Ruiz's shoulder blade. *Id.* ¶ 33. This "control hold" would allow Solopow to bend Ruiz forward if he kept refusing to walk, although Ruiz could avoid being bent over by walking forward. *Id.* Solopow states that he is familiar with the hold and understands that it "does not put pressure on or cause pain," although it does "create discomfort by being bent forward, which is instantly alleviated by stepping forward." *Id.* Solopow told Ruiz that he could lean forward and walk, but Ruiz still refused to move. *Id.* ¶ 34. Solopow ordered Ruiz to move three times, and each time, Ruiz "physically and verbally refused to move forward." *Id.*

At this point, Solopow and Ruiz were in a common area with several rows of concrete benches. Solopow Decl. ¶ 35. Reaching the temporary holding cell required navigating past the concrete benches. *Id.* The inmate who had previously told Solopow that Ruiz was yelling at him was also in the area having a video visit with his family. *Id.* Solopow believed Ruiz "may be angry at this inmate and/or want to harm him" and therefore wanted to keep the two inmates apart from each other. *Id.* When Ruiz refused to keep moving, Solopow put his right hand on Ruiz's right forearm and pushed Ruiz forward with his left palm, lifting his left arm up slightly to raise Ruiz's arms behind his back. *See id.* ¶¶ 35-36. This caused Ruiz to take a few steps forward toward the benches. *Id.* ¶ 36. Once they were near the benches, Ruiz "quickly and unexpectedly stepped up

4

onto the benches with both feet and pushed all of his bodyweight backward against [Solopow]." *Id.* ¶ 37. The movement caused Solopow to lose his balance. *Id.* ¶ 38. As he began to fall, he pivoted his foot and turned, so that Ruiz fell to Solopow's side instead of on top of him. *Id.* ¶ 43. Both of them fell to the ground. *Id.* ¶ 44. Solopow was briefly disoriented but as soon as he regained his composure, he squatted beside Ruiz. *Id.* He states that while he might have been on top of Ruiz for a second or two while he was regaining his composure, he quickly positioned himself to Ruiz's side. *Id.*

Throughout the fall, Solopow tried to maintain the same control hold, although his grip may have been dislodged for a second or two immediately after the fall. Solopow Decl. ¶ 45. Once Ruiz was on the ground and still in the control hold, he kept "thrashing his body backward and forward." *Id.* ¶ 46. Solopow ordered Ruiz to stop resisting while he maintained his grip. *Id.* Ruiz screamed profanities at Solopow in English and in Spanish. *Id.* Solopow states that, "[g]iven [Ruiz's] erratic behavior, resistance and agitation," he decided that he should not try to get Ruiz back on his feet without help. *Id.* Another deputy arrived approximately twenty to thirty seconds after Ruiz and Solopow fell. *Id.* ¶ 47. Although Ruiz initially refused to stand up, Solopow and the other deputy were eventually able to get him to stand and walk to the temporary holding cell. *Id.*

Once Ruiz was in the holding cell, a nurse arrived to examine him. Solopow Decl. ¶ 48. Ruiz complained of pain to his left cheek and the top of his left shoulder. *Id.* ¶ 49. Solopow saw minor, surface level abrasions on Ruiz's left cheek and the top of his left shoulder, but did not see any signs of bleeding, bruising, swelling, or other evidence of a contusion. *Id.* He also saw a few scratches on Ruiz's right lower torso, which were red but did not appear to be bleeding. *Id.* ¶ 50. Ruiz did not report any pain from that area. *Id.* Solopow states that the scratches may have come from Ruiz falling against his duty belt. *Id.* Solopow did not see any other signs of injury and the nurse did not note any other injuries to Ruiz. *Id.*

### 2. Ruiz's Testimony

Ruiz testifies that he was in his cell when Solopow ordered him to stop making noise. [Docket No. 60-1, Declaration of Jose Ruiz ("Ruiz Decl.") ¶ 3.] Solopow then approached Ruiz's cell, pulled him out, and handcuffed his arms behind his back. *Id.* ¶ 4. The two of them walked

5

down a flight of stairs and once they were at the bottom of the stairs, Solopow bent Ruiz's head forward, causing him pain and discomfort. *Id.* ¶ 5. Ruiz told Solopow to not bend his head forward while escorting him. *Id.* ¶ 6. According to Ruiz, Solopow "did not take time to assess if [he] was in pain and simply continued to force [him] to walk in this painful manner." *Id.* ¶ 7. Solopow's hold on him "forced [him] to walk on the tips of [his] toes," causing "extreme pain from being placed in such a stressed position." *Id.* ¶ 8. Ruiz put one of his feet on a small concrete bench "to try to gain some sort of balance" and to ease the pain from the hold. *Id.* He avers that he "never pushed back against Deputy Solopow" and did not cause either himself or Solopow to lose their balance and fall. *Id.* ¶ 9. Instead, Solopow grabbed Ruiz's shoulder "with extreme force" and "took [him] to the ground very forcefully." *Id.* ¶ 10.

Once he was on the ground, Ruiz "did not offer any resistance or engage in any threatening behavior toward Defendant Solopow or anyone else." Ruiz Decl. ¶ 12. While Ruiz was on the ground handcuffed and not resisting, Solopow "placed his forearm with force on my neck and subsequently applied force to my body while pinning me to the ground with his knee." *Id.* ¶ 13. Solopow continued to press his knee into Ruiz's back, causing Ruiz to scream out in pain. *Id.* ¶ 14. In this position, Ruiz had difficulty breathing. *Id.* ¶ 15. He states that as a result of the incident, he suffered pain in his shoulder and face. *Id.* ¶ 16. He also developed a blood clot in his shoulder that required subsequent surgery to treat. *Id.*

### B. Procedural History

Ruiz filed this case on February 11, 2020 and filed an amended complaint on April 26, 2020. [Docket Nos. 1, 18.] The court granted in part Solopow's motion to dismiss the first amended complaint, and Ruiz filed the operative complaint on August 4, 2020. [Docket No. 36.] The only remaining claim in this case is Ruiz's claim for excessive force against Solopow.

## II. REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 permits a court to take judicial notice of adjudicative facts. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

"[A] court may take judicial notice of 'matters of public record,'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and the court need not accept as true allegations that contradict facts that are judicially noticed. *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

Solopow requests that the court take judicial notice of court records relating to the criminal charges pending against Ruiz while he was detained. *See* Docket No. 57-1. The parties do not dispute that Ruiz was a pretrial detainee at the time of the incident underlying the claim in this case. Solopow does not offer any other reason why the documents are relevant to this motion. Accordingly, the request for judicial notice is denied as moot.

### III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is

1  blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not
2  adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

## IV. DISCUSSION

Solopow moves for summary judgment, arguing that there is no genuine dispute of material fact as to the reasonableness of his use of force. In the alternative, he argues that he is entitled to qualified immunity.

### A. Excessive Force

#### 1. Fourteenth Amendment Framework

A claim for excessive force implicates different standards depending on the detention status of the individual at the time of the allegedly unconstitutional use of force. The Fourth Amendment protects individuals against the excessive use of force until they have been arraigned, while the Eighth Amendment applies after conviction. *Pierce v. Multnomah Cty., Or.*, 76 F.3d 1032, 1042-43 (9th Cir. 1996). The Eighth Amendment is a "less protective" standard under which a plaintiff must show that the use of force amounts to the "unnecessary and wanton infliction of pain." *Graham v. Connor*, 490 U.S. 386, 398 (1989); *id.* at 398 n. 1. An Eighth Amendment inquiry examines the subjective motivations of the individual officer and whether the force was applied "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). By contrast, a Fourth Amendment claim requires only a showing of objective unreasonableness. *Graham*, 490 U.S. at 397-98. For post-arraignment pretrial detainees like Ruiz, the Fourteenth Amendment applies. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). A use of force against a pretrial detainee violates the Fourteenth Amendment when the force "amounts to punishment." *See Graham*, 490 U.S. at 395 n. 10; *Bell v. Wolfish*, 441 U.S. 520, 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").

At the hearing, Solopow argued that a pretrial detainee bringing a Fourteenth Amendment claim must show that the force used was not only unreasonable but was also used for the purpose of punishment, which is a different and higher standard than the showing required for a Fourth Amendment claim. *See* Reply at 2-3. Solopow misconstrues the caselaw. It is true that *Graham*

8

and *Bell* focused on "punishment" as the relevant inquiry for an excessive force claim brought by a pretrial detainee. *See Bell*, 441 U.S. at 535; *Graham*, 490 U.S. at 396 n. 10. However, *Kingsley* clarified that whether a use of force amounts to punishment is a solely objective inquiry and there does not need to be a showing that the force was intended to punish. *See* 576 U.S. at 395-97. Instead, the Court determined that a use of force is punitive when it is objectively unreasonable. *See id.* at 397; *see also Silverman v. Lane*, 2019 WL 4040111, at *3 (N.D. Cal. Aug. 27, 2019) ("Because the *Kingsley* standard applicable to excessive force claims by pretrial detainees is purely objective, it does not matter whether the defendant understood that the force used was excessive or intended it to be excessive."). The Court then listed the same reasonableness factors set forth in *Graham*, which governs in the Fourth Amendment context. *See Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396). The Court did not say that there is a higher burden to show objective unreasonableness under the Fourteenth Amendment than the Fourth Amendment.[2] Solopow has not cited any cases holding that the Fourteenth Amendment inquiry imposes a higher or different standard than the Fourth Amendment, and the court has not identified any. Instead, courts have applied the two standards identically. *See Rosales v. Cty. of Los Angeles*, 650 F. App'x 546, 548 (9th Cir. 2016) ("Because [the plaintiff] was a pre-trial detainee, the Fourth Amendment's objective reasonableness test sets the applicable constitutional limitations on the deputies' use of force." (internal quotation marks omitted) (citing *Kingsley*, 576 U.S. at 396-97)); *Neuroth v. Mendocino Cty.*, No. 15-cv-03226-RS, 2018 WL 4181957, at *14 (N.D. Cal. Aug. 31, 2018) ("The [*Kingsley*] Court explicitly adopted the standards set out in *Graham*, including the instruction that objective unreasonableness turns on the facts and circumstances of each particular case . . . ."); *Crocker v. Beatty*, 995 F.3d 1232, 1248 (11th Cir. 2021) ("[O]ur Fourteenth Amendment excessive-force analysis now tracks the Fourth Amendment's 'objective-reasonableness' standard rather than the Eighth Amendment's 'malicious-and-sadistic standard.'").

---

[2] Justice Alito dissented from the majority opinion on the basis that the Court did not explain whether or how the inquiry is any different than a Fourth Amendment claim. *See* 576 U.S. at 408 (Alito, J., dissenting) ("It is settled that the test for an unreasonable seizure under the Fourth Amendment is objective, . . . so if a pretrial detainee can bring such a claim, it apparently would be indistinguishable from the substantive due process claim that the Court discusses."). The majority opinion did not respond to this point or discuss the Fourth Amendment at all.

9

Although *Kingsley* did counsel courts to consider the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," which is not a consideration in many Fourth Amendment cases, it did so in the context of "illustrat[ing] the types of objective circumstances potentially relevant to a determination of excessive force." 576 U.S. at 397 (internal quotation marks and citation omitted). In other words, the government's interest in maintaining internal order in a detention facility is simply one of many non-exclusive factors for reasonableness under the *Graham* framework; it does not create a separate standard. *See id.*; *see also Neuroth*, 2018 WL 4181957, at *14. Consistent with the above cited authority, the court applies the objective unreasonableness standard as set forth in *Graham* and applied to pretrial detainees in *Kingsley*. The court cites some cases that relate to excessive force claims brought under the Fourth Amendment because the inquiry under *Kingsley* is the same.

### 2. Reasonableness of Force

To prevail on an excessive force claim, a pretrial detainee must show that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 397. This standard cannot be applied mechanically; instead, the objective reasonableness inquiry turns on "the facts and circumstances of each particular case." *Id.* (quoting *Graham*, 498 U.S. at 396). A court or jury must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* The inquiry must also "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell*, 441 U.S. at 540) (cleaned up). A non-exhaustive list of considerations that may bear on whether the use of force was reasonable include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citing *Graham*, 498 U.S. at 396). Under the *Kingsley* standard, "it does not matter whether the defendant understood that the force used was excessive, or

intended it to be excessive, because the standard is purely objective." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016). A pretrial detainee can prevail on a claim for excessive force by "providing only *objective* evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* (emphasis in original).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Ruiz contends that Solopow used excessive force by "deliberately and intentionally taking the Plaintiff (who was handcuffed) with extreme force to the ground," "placing his forearm with force on the Plaintiff's neck," and "subsequently applying more force to the Plaintiff's body while pinning the Plaintiff to the ground," including by "plac[ing] his knee with pressure into the Plaintiff's back area."[3] Opp. at 6.[4] Ruiz avers that he "never pushed back against Deputy Solopow" or caused the two of them to lose their balance. Ruiz Decl. ¶ 9. Instead, he asserts that he put his foot on the concrete bench to "gain some sort of balance and ease the pain" of the control hold when Solopow grabbed his shoulder and forcefully took him to the ground. *Id.* ¶¶ 8, 10. Ruiz also states that, once on the ground, he "did not offer any resistance or engage in any threatening behavior toward Defendant Solopow or anyone else." *Id.* ¶ 12. Ruiz argues that Solopow's use of force was unreasonable because Ruiz was unarmed, handcuffed, and did not pose any threat to Solopow. Opp.

---

[3] At the hearing, Ruiz confirmed that these are the only actions he is challenging in this case.

[4] The court cites the page numbers generated by ECF because the opposition brief does not contain other page numbers.

11

at 6.

Solopow argues that his use of force was reasonable as a matter of law. According to Solopow, the undisputed facts and the video evidence establish that Solopow "responded to Plaintiff's refusal to move with a control hold"; Ruiz stepped up onto the bench and "push[ed] violently back" on Solopow; Solopow "defended himself when Plaintiff pushed off the bench"; Solopow used only minimal force in redirecting Ruiz's backward momentum; and Solopow restrained Ruiz on the ground for "mere seconds" until help arrived. Mot. at 11, 12, 14; Reply at 2. Solopow also asserts that the incident only occurred because Ruiz violated jail rules on multiple occasions; Solopow was "attempting to prevent matters from escalating and involving other inmates"; and Solopow reasonably believed that Ruiz presented a threat to both himself and others in the housing unit. Mot. at 10, 15; Reply at 2.

Contrary to Solopow's assertions, there are disputed material facts in this case. For example, Solopow asserts that Ruiz "quickly and unexpectedly stepped up onto the benches with both feet and pushed all of his bodyweight backward," causing both Ruiz and Solopow to fall to the ground. Solopow Decl. ¶¶ 37-38. By contrast, Ruiz contends that he put one of his feet on the bench to regain balance and alleviate the pain from Solopow's control hold. Ruiz Decl. ¶¶ 7-9. He also testifies that he did not push back against Solopow and that instead, Solopow grabbed him and took him to the ground. *Id.* ¶¶ 9-10. Solopow argues that the court can grant summary judgment despite these disputed facts because the "video clearly displays Plaintiff stepping up onto the bench and pushing violently back on Deputy Solopow immediately before the minimal force was employed." Mot. at 11. Not so. The relevant portion of the video lasts approximately 3-5 seconds and the image is shaky and largely obscured. *See* Video at 2:45-2:49. Solopow's account of the incident is far from indisputable based on a few seconds of ambiguous video footage. Solopow also contends that regardless of Ruiz's intent on stepping on the bench, "any reasonable officer would have believed they were being attacked" and taking Ruiz to the ground was a reasonable response to the perceived threat. *See* Mot. at 16; *see also Saucier v. Katz*, 533 U.S. 194, 195 (2001), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force

12

than in fact was needed."). This argument is also unconvincing. Whether it was reasonable for Solopow to believe Ruiz was about to attack him is a question for the jury. Additionally, even if the use of a takedown maneuver was reasonable, there is still a question of fact about whether it was too forceful. There are also factual disagreements about the extent of force Solopow used while Ruiz was on the ground. Solopow asserts that while he "may have been partially on top of Plaintiff for a second or two while regaining [his] composure," he immediately transitioned to a squatting position beside Ruiz. Solopow Decl. ¶ 44. By contrast, Ruiz states that Solopow put his forearm against Ruiz's neck and pinned Ruiz down with his knee.[5] Ruiz Decl. ¶¶ 13-14. The video does not resolve the inconsistencies between these accounts. It appears to show Ruiz's face pressed into the ground within 1-2 seconds after the fall and Solopow's voice can be heard saying, "You got a problem here?" Video at 2:49-2:50. There are also a few frames that a viewer might interpret to show Solopow's forearm pressed into the back of Ruiz's head or neck. *Id.* Notably, Solopow never clarifies whether he put his forearm on Ruiz's neck, so it is not clear whether he denies doing it or whether he instead contends that it was not excessive force. Solopow also argues that the video shows his squatting position, apparently to rebut Ruiz's account that Solopow was on top of him, but the video never clearly shows Solopow's position in relation to Ruiz. Ruiz's account of the interactions is therefore not inconsistent with the video evidence.

Finally, Solopow contends that Ruiz suffered at most minor injuries, which confirms that

---

[5] Invoking the "sham affidavit rule," Solopow argues that the court should disregard Ruiz's assertion that Solopow used his knee on Ruiz's back because it contradicts Ruiz's earlier deposition testimony that he does not remember how Solopow held him down. Reply at 6-7; *see Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *see also* Ruiz Depo. Vol. 2 at 140:18-141:4 (Q: "Do you remember how Deputy Solopow was holding you on the ground?" A: "No, I don't remember anymore how he was – how he was holding me down."). The court disagrees. *Kennedy*, cited by Solopow, makes clear that a court should "use caution" in applying the sham affidavit rule because it is the role of the jury to decide questions of credibility, including the import of a party's inconsistent statements. *See Kennedy*, 952 F.2d at 266-67. The rule only applies if the court makes a factual finding that the testimony at issue is a "sham" that "flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment," instead of "an honest discrepancy, a mistake, or the result of newly discovered evidence." *Id.* at 267. Given the sparse argument on this issue, the court declines to make such a finding here. Solopow may elicit the discrepancy in Ruiz's testimony for the jury's consideration. In any case, even if the court disregarded Ruiz's statement about Solopow using his knee, there are other material disputed facts that make Ruiz's section 1983 claim unsuitable for resolution at summary judgment.

13

1   the use of force was minimal. Mot. at 13. However, the Supreme Court has explicitly recognized
2   that "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."
3   *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010); *see also id.* ("An inmate who is gratuitously beaten by
4   guards does not lose his ability to pursue an excessive force claim merely because he has the good
5   fortune to escape without serious injury."). The extent of the plaintiff's injury is only one
6   consideration in deciding whether the use of force was objectively reasonable. *See Kingsley*, 576
7   U.S. at 394. Ruiz asserts that he suffered pain as a result of the incident and developed a blood clot
8   that required surgery to treat. Ruiz Decl. ¶ 16. The extent of Ruiz's injuries as well the significance
9   of any injuries in relation to the amount of force used are disputes that are best resolved by a jury.

10   In sum, the record in this case reveals numerous issues of disputed material facts. Viewing
11   the evidence in the light most favorable to Ruiz, the court finds that a reasonable jury could conclude
12   that the specific uses of force challenged by Ruiz were objectively unreasonable under the
13   circumstances.

14   **B.   Qualified Immunity**

15   The doctrine of qualified immunity protects government officials "from liability for civil
16   damages insofar as their conduct does not violate clearly established statutory or constitutional rights
17   of which areasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
18   The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the court
19   must ask whether the facts alleged show that the officer's conduct violated a constitutional right.
20   *Saucier*, 533 U.S. at 201s. If the answer is "no," then the court need not inquire further before ruling
21   that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on
22   a favorable view of the parties' submissions," the court must examine "whether the [constitutional]
23   right was clearly established." *Id*. The court may exercise its discretion in deciding "which of the
24   two prongs of the qualified immunity analysis should be addressed first in light of the circumstances
25   in the particular case at hand." *Pearson*, 555 U.S. at 236.

26   With respect to the first prong of the *Saucier* inquiry, the court determined above that a
27   reasonable jury could find that Solopow's use of force against Ruiz was unreasonable and therefore
28   a violation of his Fourteenth Amendment rights. For the second prong, Solopow contends that he

is nonetheless entitled to qualified immunity because "[t]here is simply no precedent holding that an officer, confronted with a physically combative and resisting inmate, may not employ a control hold." Mot. at 20. He also contends that even if he did force Ruiz to the ground, there is no established precedent prohibiting the maneuver in response to Ruiz's resistance. *Id.* at 21. Solopow's qualified immunity analysis and authorities rely completely on facts that the court above concluded are material and disputed, including whether Solopow reasonably believed Ruiz was about to attack him, the extent of force Solopow used in response, and Solopow's actions once Ruiz was on the ground. Where, as here, there are genuine issues of fact "preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

Accordingly, the issue of qualified immunity cannot be determined on summary judgment.

## V.  CONCLUSION

For the reasons stated above, the court denies Solopow's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: September 3, 2021



_____
Judge Donna M. Ryu
United States Magistrate Judge